**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GENTIVA HEALTH SERVICES, INC., | |
| *Plaintiff*, | |
| v. | Civil Action No. 19-2271 (RDM) |
| NORRIS COCHRAN,[1] | |
| *Defendant*. | |

**MEMORANDUM OPINION**

When Congress failed to pass a budget in fiscal year 2013, the failure triggered a statutorily mandated process culminating in government-wide "sequestration," a tightening of purse strings across a broad range of programs.  Budget Control Act of 2011, 2 U.S.C. § 900 *et. seq*.  One of the many affected programs was Medicare.  *Id.* § 906(d).  Plaintiff Gentiva Health Services, Inc. ("Gentiva") brings this action pursuant to the Medicare statute, 42 U.S.C. § 1395oo(f), challenging the manner in which the Secretary of the Department of Health and Human Services ("Secretary") implemented the sequestration beginning in April 2013.  Gentiva maintains that the Secretary miscalculated overpayments made to Gentiva for the hospice services it provided during that fiscal year.

The parties have cross-moved for summary judgment.  For the reasons explained below, the Court concludes that the Secretary has the better of the argument.  The Court will therefore **DENY** Gentiva's motion for summary judgment and will **GRANT** the Secretary's cross-motion for summary judgment.

---

[1] Acting Secretary Norris Cochran is automatically substituted for former Secretary Alex Azar pursuant to Fed. R. Civ. P. 25(d).

# I. BACKGROUND

**A.    Statutory Background**

This case deals with Medicare and sequestration, two markedly complex regimes. Before moving to the specific facts of this case, therefore, the Court will lay out the legal framework at play.

   1.   *Medicare Statute and Hospice Caps*

The Medicare program, established in 1965 by Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* ("Medicare Statute"), has long compensated healthcare providers for certain medical services on behalf of qualifying patients. *Id.* § 1395d(a); *see also* Social Security Act, Pub. L. No. 89-97, § 1812, 79 Stat. 286, 291–92. In 1982, Congress added payment for palliative and support services provided by hospice programs to terminally ill Medicare beneficiaries. Provisions Relating to Savings in Health and Income Security Programs, Pub. L. No. 97-248, 96 Stat. 324, 356–63 (1982). But to keep such costs in hand, the lawmakers mandated that each provider would be subject to an annual cap. Under this cap—known as the "aggregate cap"—"[t]he amount of payment . . . for hospice care provided by (or under arrangements made by) a hospice program for an accounting year may not exceed the 'cap amount' for the year . . . multiplied by the number of [M]edicare beneficiaries in the hospice program in that year." 42 U.S.C. § 1395f(i)(2)(A). "The intent of the hospice aggregate cap was to protect Medicare from spending more for hospice care than it would for conventional care at the end of life." Medicare Program; FY 2015 Hospice Wage Index and Payment Rate Update; Hospice Quality Reporting Requirements and Process and Appeals for Part D Payment for Drugs for Beneficiaries Enrolled in Hospice, 79 Fed. Reg. 50,452, 50,471 (Aug. 22, 2014) ("FY 2015 Final Rule"). The "cap amount" was originally set at $6,500 in 1983 and has grown each year

since then based on the medical care category of the Consumer Price Index for All Urban Consumers, 42 U.S.C. § 1395f(i)(2)(B); 42 C.F.R. § 418.309, growing to $26,157.50 for the 2013 cap year, *see* FY 2015 Final Rule, 79 Fed. Reg. at 50,471.  A further limitation—known as the "inpatient cap"—also keeps payments made to hospice providers in check.  The Secretary reimburses providers for inpatient services only to a certain extent; if more than 20 percent of Medicare beneficiaries' hospice care days are inpatient days, Medicare does not fully reimburse providers for the excess inpatient days.  42 U.S.C. § 1395x(dd)(2)(A)(iii); 42 C.F.R. § 418.302(f).

The Centers for Medicare and Medicaid Services ("CMS") oversees the Medicare program, and CMS relies on Medicare Administrative Contractors ("MACs") to administer the process for the payment of providers, including hospice caregivers.  42 C.F.R. §§ 421.100–421.104; 42 U.S.C. § 1395h(a).  To do so, MACs must cope with the following difficulty: Although the Medicare statute requires MACs to reimburse hospice providers for services to Medicare beneficiaries *throughout* the fiscal year and "not less often than monthly," *id.* §§ 1395g(a), 1395h(c)(2), MACs do not know what a given hospice's annual aggregate cap will be until the *end* of the fiscal year.  As a result, MACs may overpay providers during the year and need to collect those overpayments after the fiscal year closes.

A regulatory process has emerged to navigate this difficulty.  Throughout the fiscal year, MACs pay hospices a "fixed" amount "for each day during which the beneficiary is eligible and under the care of the hospice" depending on the "categor[y] of hospice care" provided "for any particular day."  42 C.F.R. § 418.302(c) & (e); *see also id.* § 418.302(d); 42 U.S.C. § 1395g(a). The hospices receive these reimbursements no less than monthly.  Dkt. 9-1 at 18; 42 U.S.C. §§ 1395g(a), 1395h(c)(2).  A hospice can keep track of its costs and monitor data relevant to

estimating its annual inpatient and aggregate caps through the Medicare Provider Statistical and Reimbursement System ("PS&R"). Medicare Program; Hospice Wage Index for Fiscal Year 2012, 76 Fed. Reg. 47,302, 47,325 (Aug. 4, 2011). After the end of the fiscal year, the MACs calculate each hospice's inpatient and aggregate caps, an exercise that historically was not completed until 16 to 24 months after the close of the applicable fiscal period, *see* Medicare Program; FY 2015 Hospice Wage Index and Payment Rate Update; Hospice Quality Reporting Requirements and Process and Appeals for Part D Payment for Drugs for Beneficiaries Enrolled in Hospice, 79 Fed. Reg. 26,538, 26,557 (May 8, 2014) ("FY 2015 Proposed Rule"); Dkt. 9-1 at 11, although CMS has endeavored to expedite this process, FY 2015 Final Rule, 79 Fed. Reg. at 50,472. After the MAC makes a "final determination of program reimbursement," "[p]ayments made to a hospice during a cap period that exceed the [annual aggregate cap] are overpayments and must be refunded." 42 C.F.R. §§ 418.308, 405.1803(a). A similar process applies to the inpatient cap, and, if the MAC determines "[a]t the end of a cap period" that the hospice exceeded the cap, "any excess reimbursement must be refunded by the hospice." 42 C.F.R. § 418.302(f).

A hospice that "is dissatisfied with a final determination" may "file[] a request for a hearing within 180 days after notice of the [MAC's] final determination," to appeal the decision to the Provider Reimbursement Review Board ("Board" or "PRRB"), an independent administrative tribunal "composed of five members appointed by the [HHS] Secretary," with "the power to affirm, modify, or reverse a final determination." 42 U.S.C. § 1395oo(a), (d), (h); *see also* 42 C.F.R. § 418.311. In reviewing a MAC's final determination, the Board "must comply with all the provisions of [the Medicare statute] and regulations issued thereunder, as well as CMS [r]ulings" and must "afford great weight to interpretive rules, general statements of

policy, and rules of agency organization, procedure, or practice established by CMS." 42 C.F.R. § 405.1867. The Board's decision is final unless the Secretary reverses, affirms, or modifies the decision within 60 days after the provider receives notice of the decision. 42 U.S.C. § 1395oo(f)(1). If the Secretary does act within that 60-day window, the provider may seek judicial review of the Board decision "within 60 days of the date on which notice of any final decision by the Board . . . is received." *Id.*

  2. *Sequestration*

  This case also involves another complex statute: the Budget Control Act of 2011 ("Budget Control Act" or "BCA"). The Budget Control Act includes a "sequestration" provision that requires the President to reduce nonexempt spending programs across the board. *See* 2 U.S.C. § 901a. To achieve this goal, the BCA specifies formulas for applying sequestration to affected programs and charges the Office of Management and Budget ("OMB") with the responsibility of calculating these reductions, should they be triggered. *Id.* After OMB determines required reductions, the President must issue an order implementing the cuts. *Id.* § 904(f)(5). Medicare is among the covered programs. *Id.* § 906(d). The BCA specifies that "the percentage reduction . . . shall apply . . . to individual payments for services furnished during the one-year period beginning on the first day of the first month beginning after the date the [President's] order is issued . . . such that the reduction made in payments under that order shall achieve the required total percentage reduction in those payments for that period." *Id.* "The percentage reduction for the Medicare programs," however, "shall not be more than 2 percent for a fiscal year." *Id.* § 901a(6)(A); *see also Cmty. Oncology All., Inc. v. OMB*, No. 19-5116 (D.C. Cir. Feb. 16, 2021).

Pursuant to the Budget Control Act, OMB issued a report to Congress on March 1, 2013 determining that Congress's failure to enact legislation reducing the deficit by $1.2 trillion had triggered the sequestration requirement for the 2013 fiscal year.  *See* Office of Management and Budget Report to the Congress on the Joint Committee Sequestration for Fiscal Year 2013, at 1 (2013) ("OMB Report").[2]  Among an array of other cuts, the 2013 sequestration required "reductions of 2.0 percent to Medicare."  *Id.*  That same day, President Obama issued an executive order directing "that budgetary resources in each non-exempt budget account be reduced by the amount calculated by the Office of Management and Budget in its report to the Congress of March 1, 2013."  Executive Order, Sequestration Order for Fiscal Year 2013 Pursuant to Section 251A of the Balanced Budget and Emergency Deficit Control Act, as Amended, 78 Fed. Reg. 14,633 (Mar. 6, 2013) ("Executive Order").  As dictated by the BCA, the reductions to Medicare spending took effect on April 1, 2013, which was "the first day of the first month beginning after the date the [Executive] [O]rder [was] issued."  2 U.S.C. § 906(d)(1)(A); Dkt. 8-1 at 18; Dkt. 9-1 at 12.

**B.    Factual Background**

Plaintiff Gentiva and its subsidiaries "Kindred at Home" operate hospices nationwide, including the six hospices at issue in this case.  Dkt. 1 at 1 (Compl. ¶ 2).  Each of these six hospices participated in the Medicare program in FY 2013 and was entitled to payment for offering care to terminally ill Medicare beneficiaries.  *See* Dkt. 1 at 9, 11 (Compl. ¶¶ 34, 42) (establishing that each of the hospices "received one or more [c]ap [o]verpayment determinations from their MACs for" FY 2013 and listing the six hospices).  Shortly after President Obama

---

[2] *Available at* https://obamawhitehouse.archives.gov/sites/default/files/omb/assets/legislative_reports/fy13ombjcsequestrationreport.pdf.

issued his March 1, 2013 sequestration order, CMS announced that "Medicare [fee-for-service] claims with dates-of-service or dates-of-discharge on or after April 1, 2013 [would] incur a 2 percent reduction in Medicare payment." Dkt. 14-1 at 10 & n.32 (AR 10). For the next two years, however, CMS offered little official guidance regarding how the 2 percent reduction would apply to the hospice aggregate cap. Finally, on March 3, 2015, the agency issued a Technical Direction Letter ("TDL") to its MACs providing instructions "on how the sequestration amounts shall be handled pertaining to the hospice cap calculation." Dkt. 14-1 at 25 (AR 25).

As explained above, the Medicare statute requires MACs to reimburse hospices for services provided to terminally ill Medicare beneficiaries on a monthly basis, but those payments are only preliminary; among other things, the MACs cannot determine the aggregate cap until the end of the fiscal year, and they do not make final determinations of program reimbursement until months (or years) after the services are provided and the preliminary payments are made. As the PRRB later observed: "Not surprisingly, CMS [did] not want to knowingly overpay providers, so it [did] not wait until the close of the [fiscal] year to apply sequestration[;] . . . [r]ather, CMS applie[d] sequestration up front throughout the cap year to any interim hospice payments made prior to the [fiscal]-year end." Dkt. 14-1 at 17 (AR 17). At the end of the cap year, however, CMS still needed to make a final determination of program reimbursement.

Under the methodology set forth in the TDL, the MACs were first required to add the amounts that had been withheld from the preliminary monthly payments as a result of sequestration back to the net preliminary payments. *Id.* at 25 (AR 25). In other words, they were required to determine the payments that would have been made without sequestration (and without application of the cap). They were then required to determine the aggregate cap and to

apply the cap to the pre-sequester reimbursement amount to determine the pre-sequester amount in excess of the cap. *Id.* If the pre-sequester reimbursement amount exceeded the cap, the MACs were required to reduce the overpayment "to reflect the actual amount paid to the hospice." *Id.* To that end, the MACs reduced the calculated overpayment by 2 percent (thus giving hospices credit for the sequestered amount that had been withheld) to determine the final overpayment amount. *Id.*[3]

Simplified examples illustrate how the calculation works. Although sequestration did not start until April 2013, for simplicity's sake, the following examples assume that sequestration applied to the entire fiscal year and assume an unrealistically low annual aggregate cap of $1,000. The examples assume, again for simplicity's sake, that efficient hospice A received $1,000 in payments throughout the year, while inefficient hospice B received $1,200.

Table 1

| CMS TDL Method | | |
|---|---|---|
| | Hospice A | Hospice B |
| A. Annual Aggregate Cap | $1,000 | $1,000 |
| B. Actual Preliminary Payments | $980 | $1,176 |
| C. Sequestered Amount | $20 | $24 |
| D. Pre-sequestration Reimbursement Amount (B+C) | $1,000 | $1,200 |
| E. Pre-sequestration Amount in Excess of Cap (D-A) | $0 | $200 |
| F. 2% of the Pre-sequester Amount Overpayment | $0 | $4 |
| G. Revised Payment in Excess of Cap (E-F) | $0 | $196 |
| H. Final Amount Retained by Hospice (B-G) | $980 | $980 |

---

[3] Under the TDL method, "[t]he [2 percent] overpayment reduction cannot be greater than the actual sequestration amount reported on the PS&R." Dkt. 14-1 at 19–20 (AR 19–20) (quoting *id.* at 25 (AR 25)). As the PRRB explained, this caveat exists for hospices that had already exceeded their annual aggregate caps for fiscal year 2013 before sequestration began on April 1, 2013. *Id.* For these "extremely rare" circumstances, the TDL instructs that the overpayment calculation shall be reduced by the lesser of two amounts: the actual sequestered amount or 2 percent of the pre-sequester amount in excess of the cap. *Id.*

As this example demonstrates, under the TDL's approach, the inefficient hospice is subject to a cap-based repayment obligation of $196, while the efficient hospice owes nothing. More generally, the TDL's approach results in an across-the-board 2 percent cut to Medicare spending on hospices; regardless of the amount of overpayment a hospice has received, the maximum amount of payment it can receive (in the example) is $980, or 98 percent of the otherwise applicable $1,000 maximum.

Because "most hospices [do] not [typically] exceed their aggregate cap," most were unaffected by the implementation of the TDL's methodology.  Dkt. 14-1 at 17 (AR 17).  That was not the case, however, with respect to the six Gentiva hospices at issue in this case. Although their MACs' "first overpayment calculations did not take sequestration into account," Dkt. 14-1 at 466 (AR 1142); *see also id*. at 29 (AR 163), the MACs eventually issued each of the six hospices a final notice of hospice cap determination for the fiscal year ending October 31, 2013 consistent with the methodology set forth in the TDL.  See Dkt 14-1 at 504 (AR 1376) (Gentiva); *id.*at 505 (AR 1380) (Family Hospice, Ltd.); *id*. at 506 (AR 1384 (Vistacare USA); *id.* at 507 (AR 1388) (Gilbert's Hospice Care); *id.* at 508 (AR 1392) (Odyssey Healthcare Operating A, LP); *id.* at 509 (AR 1396) (Integracare of Athens).  Integracare of Athens provides an illustrative (and legible) example of how that worked.  The hospice received preliminary payments of $1,377,683.22, which increased to $1,394,352.41 when the sequestered amount of $16,769.19 was added back.  *Id.*  That amount exceeded the hospice's aggregate cap of $1,380,171.71 by $14,181.  *Id.*  Two percent of the excess rounded to $284, which was then subtracted from the amount in excess of the cap, yielding an excess amount of $13,897, which Integracare was required to repay to the Medicare program.  *Id.*

The Gentiva hospices disagreed with the methodology mandated by CMS and applied by their MACs.  In their view—and in Gentiva's view in this litigation—CMS and the MACs erred in adding back the sequestration amount prior to applying the cap and, instead, should have simply applied the cap to the sum of the preliminary payment amounts the hospices received throughout the year.  Dkt. 8-1 at 29–30.  Continuing the example from above, the following chart provides hypothetical calculations for two hospices, one efficient and the other inefficient, under two scenarios—one with no sequestration and one with sequestration but applying Gentiva's proposed methodology.

Table 2

| No Sequestration | | |
|---|---|---|
| | Hospice A | Hospice B |
| A. Annual Aggregate Cap | $1,000 | $1,000 |
| B. Actual Preliminary Payments | $1,000 | $1,200 |
| C. Amount Overpayment | $0 | $200 |
| D. Final Amount Retained by Hospice | $1,000 | $1,000 |
| With 2 Percent Sequestration | | |
| A. Annual Aggregate Cap | $1,000 | $1,000 |
| B. Actual Preliminary Payments | $980 | $1,176 |
| C. Amount Overpayment | $0 | $176 |
| D. Final Amount Retained by Hospice | $980 | $1,000 |

The bottom line of the methodology that Gentiva advocates is that the inefficient hospice is subject to a cap-based overpayment of only $176, substantially lower than the $196 overpayment derived under the CMS-mandated methodology in Table 1.  Moreover, under this methodology, Hospice B ultimately retains the same payment amount with or without sequestration; the across-the-board cuts do not reach it.  Under the actual facts of this case, Gentiva posits that the difference between the CMS methodology and its preferred methodology resulted in a $383,903.79 loss across the six hospices at issue.  Dkt. 1 at 11 (Compl. ¶ 42).

The six hospices timely filed a group appeal of the MACs' cap overpayment determinations to the Board.  Dkt. 8-1 at 24; Dkt. 14-1 at 124–451 (AR 628–955).  The Board held a hearing on August 23, 2017, *id.* at 73–112 (AR 575–614), and issued its decision on May 31, 2019, *id.* at 6–23 (AR 6–23).  As the Board explained, the hospices argued "that CMS improperly altered the hospice cap calculation by instructing its contractors to include certain funds that were sequestered but never paid to the [hospices] in the amount of payment made to the [hospices]." *Id.* at 11–12 (AR 11–12).  Instead, in the view of the hospices, CMS should have used "the net reimbursement (actual amount received by the hospice) in determining [by] how much they exceeded their aggregate caps." *Id*. at 12 (AR 12).  The Board, however, was unconvinced.  It first concluded that "nothing in the Medicare statutory or regulatory provisions governing hospice payment . . . identifie[s] a hospice's 'total Medicare payment' as the *net* reimbursement to the hospice." *Id*. at 14 (AR 14).  And, beyond that, the Board concluded that because "the hospice cap is an integral part of determining 'the [Medicare] amount paid' to hospices," *id.* (alteration in original), "the 'amount paid' or the 'amount of payment' to a hospice must be viewed on a cap year basis"—and not based on "*interim*," monthly payments, *id*. at 15 (AR 15) (emphasis in original).  It is that annual payment determination, then, which constitutes the "amount to which sequestration applies." *Id.*

The fact that MACs deducted 2 percent from the interim payments did not, in the Board's view, alter its conclusion that the "amount paid" to each hospice must be determined after the cap is applied.  As the Board explained, the "up-front application of sequestration" was both "practical given that most hospices" do not "exceed their aggregate cap . . . and, thus, have no overpayment at the cap-year end," and advisable to avoid "knowingly overpay[ing] providers" on a monthly basis, only to recoup those overpayments "as part of the cap-year-end

reconciliation and accounting process." *Id.* at 17 (AR 17).  Although CMS's decision "to apply sequestration up front" required the agency "to go through a more complex end-of-year reconciliation," it did not change the nature of the payments at issue or the ultimate bottom line. *Id.* at 18 (AR 18).  Indeed, the Board explained that paying the hospices "their entire aggregate cap amount despite the sequestration order" would effectively exempt inefficient hospices from sequestration, in violation of the Budget Control Act and the Executive Order.  *Id.* at 22.

On June 27, 2018, CMS declined to review the Board's decision.  Dkt. 8-1 at 26.  The Board's decision, accordingly, constitutes the Secretary's final determination regarding the proper calculation of the hospices' 2013 cap year overpayments. 42 U.S.C. § 1395oo(f)(1). Gentiva, as the operator of the six hospices, then timely filed this action on July 30, 2019. Dkt. 1.  It claims that the Board's decision "is contrary to the plain language of" the Medicare statute and the Budget Control Act and is arbitrary and capricious.  *Id.* at 13–14 (Compl. ¶¶ 49– 51).  Gentiva asks that the Court declare the Board's decision unlawful; reverse and vacate the decision; order the MACs to recalculate their overpayments for fiscal year 2013 in the manner it proposes; order the Secretary "promptly to return to [Gentiva's] [h]ospices the portions of the [c]ap [o]verpayment collected from [the h]ospices attributable to the improper inclusion of sequestered funds in the hospice cap determinations, plus interest;" and enjoin the Secretary and the MACs from using their allegedly flawed calculation method for fiscal year 2013 or any year thereafter.  *Id.* at 14 (Compl. ¶ 52).

Gentiva moved for summary judgment on February 11, 2020.  Dkt. 8-1, and the Secretary cross-moved for summary judgment on April 17, 2020, Dkt. 9-1.  On November 3, 2020, the Secretary filed a notice of supplemental authority, drawing the Court's attention to the recent decision in *Silverado Hospice, Inc. v. Azar*, No. SA-CV 19-1007, 2020 WL 6821073 (C.D. Cal.

Oct. 30, 2020).  Dkt. 16; Dkt. 16-1.  In that case, which is similar to this one, the U.S. District

Court for the Central District of California granted the Secretary's motion for summary judgment

and denied the cross-motion of the hospice plaintiffs.  *Silverado*, 2020 WL 6821073, at *1.

Gentiva promptly responded to that notice, arguing that the *Silverado* decision does not address

additional arguments that it makes in this case.  Dkt. 17.

## II.  LEGAL STANDARD

The Court's jurisdiction is premised on the Medicare statute, 42 U.S.C. § 1395oo(f)(1),

which authorizes judicial review under the same standards applicable under the Administrative

Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*; *Humana, Inc. v. Heckler*, 758 F.2d 696, 698–99

(D.C. Cir. 1985) ("The Medicare Act itself incorporates the standard of review set out in section

706 of the Administrative Procedure Act."); *Flint v. Azar*, 464 F. Supp. 3d 1, 7 (D.D.C. 2020).

The Court, accordingly, must consider whether the Secretary (acting through the PRRB)

"violated the Administrative Procedure Act by taking action that is 'arbitrary, capricious, an

abuse of discretion or otherwise not in accordance with law,'" *Forsyth Mem'l Hosp., Inc. v.

Sebelius*, 639 F.3d 534, 537 (D.C. Cir. 2011) (quoting 5 U.S.C. § 706(2)(A)), or "in excess of

statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C).

This review is "fundamentally deferential."  *Fox v. Clinton*, 684 F.3d 67, 75–76 (D.C. Cir. 2012).

Nonetheless, the APA requires that "an agency's decreed result be within the scope of its lawful

authority" and that "the process by which it reaches that result . . . be logical and rational."

*Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998).

## III.  ANALYSIS

Although at times overlapping, Gentiva's challenges fall into three general groups.  First,

it argues that the Board's decision is inconsistent with the Medicare statute, regulations, and the

Budge Control Act and thus is "not in accordance with law" and is "in excess of statutory jurisdiction, authority, or limitations."  *See* 5 U.S.C. § 706(2)(A) & (C); Dkt. 8-1 at 33–39. Second, it argues that the decision improperly defers to the TDL and relies on statutory and regulatory provisions not applicable to hospices, rendering the decision "arbitrary and capricious."  *See* 5 U.S.C. § 706(2)(A); Dkt. 8-1 at 31–33, 44–47.  Third, it contends that the decision departs from longstanding CMS policy without providing a reasoned basis for doing so—and without even acknowledging the departure—and that CMS never gave providers reasonable notice of its about-face.  *Id.* at 39–44.  As explained below, each of these challenges fails.

A.      **Challenges to the Board's Decision's Consistency with the Governing Law**

Although Gentiva raises both procedural and substantive challenges to the Board's decision, its principal objection is that CMS added the sequestration deductions back to the actual preliminary payments before applying the aggregate cap and, then, only accounted for sequestration after calculating the payments in excess of the cap.  This was a mistake, according to Gentiva, because the hospice cap provision of the statute and the corresponding regulation require CMS to calculate the cap based on the "*amount of payment made* under [Medicare Part A] for hospice care provided by . . . [the] hospice program for [the] accounting year," 42 U.S.C. § 1395f(i)(2)(A) (emphasis added); *see also* 42 C.F.R. § 418.308(d) ("Payments made to a hospice during a cap period that exceed the cap amount are overpayments and must be refunded."), and the "amount of payment" actually "made" to the six hospices included the initial sequestration deduction.  Dkt. 8-1 at 34–35.  In other words, in Gentiva's view, the "plain language" of the hospice cap provision and "the controlling regulation," Dkt. 8-1 at 33, require that the cap overpayment determination be calculated using the "historical payments" made to

14

the hospices and not the "fictitious payments" that the hospices would have received had the

MACs waited until after the cap adjustments were applied to deduct the sequestration amount, *id.*

at 36–37.

In assessing this argument, the Court considers—as it must, *see SEC v. Chenery Corp.*,

318 U.S. 80, 87 (1943)—the Board's analysis.  The Board's decision, moreover, "is entitled to

considerable deference."  *Marymount Hosp., Inc. v. Shalala*, 19 F.3d 658, 661 (D.C. Cir. 1994).

To the extent the decision is based "on the language of the Medicare Act itself, [the Court]

owe[s] [the Board] deference under *Chevron U.S.A.*[,] *Inc. v. Natural Resources Defense*

*Council, Inc.*, 467 U.S. 837, 843–45 (1984)," and must, accordingly, apply the traditional two-

step analysis.  *Id.*  Under that approach, if Congress has addressed the "question at issue," that

determination is controlling.  *Id.* (quoting *Chevron*, 467 U.S. at 843).  But, "when the statute is

silent or ambiguous with respect to the specific issue, the question 'is whether the agency's

answer is based on a permissible construction of the statute.'"  *Id.* (quoting same).  Here, the

Court concludes that the Board's decision was not only reasonable, but that it reflects the best

reading of the Medicare statute, as well as the Budget Control Act.  Gentiva's argument,

accordingly, fails at *Chevron* steps one and two.

As the Board observed, "how the hospice cap interacts with sequestration is key to

understanding the issue in this case."  Dkt. 14-1 at 14 (AR 14).  To resolve that question, the

Court must start, as did the Board, with the plain language of the Medicare statute.  *See United*

*States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240–41 (1989).  And, the Court concludes, as

did the Board, that nothing in the language of the statute required CMS to apply the aggregate

cap to the *periodic* payments made over the course of the year, as opposed to the payments due

the participating hospices under the Medicare statute based on the final, year-end reconciliation.

In other words, the payments "made" under the Medicare statute may not exceed the cap, even if another statute—the Budget Control Act—further reduces the amount of the payments made. Other indicia of congressional intent, moreover, support the view that CMS applied the correct methodology.

In arguing that CMS should have applied the aggregate cap to the total, *periodic* payments, Gentiva relies in large part on the language of § 1395f(i)(2)(A), which provides:

> The *amount of payment made* under this part for hospice care provided by (or under arrangements made by) a hospice program for an accounting year may not exceed the "cap amount" for the year . . . multiplied by the number of Medicare beneficiaries in the hospice program in that year.

42 U.S.C. § 1395f(i)(2)(A) (emphasis added).  In Gentiva's view, "the amount of payment made" for the services provided by the six hospices in fiscal year 2013 is a matter of historical fact: that is, "the amount of payment" for purposes of the aggregate cap calculation is the amount each hospice had received by the time the cap was calculated.

The Court is unpersuaded. The statute does not say, as Gentiva posits, that "[t]he amount of [periodic] payments made" may not exceed the aggregate cap.  Nor is it otherwise retrospective, requiring consideration of amounts previously paid.  Gentiva's argument turns on the premise that the phrase "amount of payment made" uses the past tense—that is, refers to historical payments—but that construction is difficult to reconcile with the next clause of § 1395f(i)(2)(A), which provides that the payment "may not exceed the 'cap amount' for the year," an amount that cannot be determined until the year concludes.  Indeed, if the "amount of payment made" referred to the sum of payments made throughout the year to the hospices, then 42 U.S.C. § 1395(f)(i)(2)(A) would demand the impossible of a MAC: that it ensure preliminary payments to a hospice not exceed an as-yet-unknown amount.  Nor does the provision contain any qualifying language permitting the "payment made" to exceed the cap even temporarily.  *See*

*Silverado*, 2020 WL 6821073, at *4 ("Because such overpayments would violate the . . . Medicare Act, 'amount of payment made' must not refer to monthly payments disbursed to providers, as Plaintiffs assert.").  Section 1395f(i)(2)(A) makes sense, however, if the phrase "amount of payment made" is understood as the passive voice formulation of the phrase "the amount of payment that the Secretary makes."  Understood in this way, the statute provides that "the amount of payment made under this part for hospice care provided by . . . a hospice program for an accounting year"—regardless of when the payment is made—may not exceed the cap.  42 U.S.C. § 1395f(i)(2)(A).  And, to ensure that participating hospices were paid no more than the cap amount for fiscal year 2013, the MACs had to first determine the amount the hospices were entitled to receive "under this part"—that is, under Medicare Part A—for providing hospices services during the "accounting year."

Gentiva's reliance on § 1395f(i)(1)(A) is equally unavailing.  That provision provides, in relevant part:

> Subject to the limitation under paragraph (2) . . . , the amount paid to a hospice program with respect to hospice care for which payment may be made under this part shall be an amount equal to the costs which are reasonable and related to the cost of providing hospice care or which are based on such other tests of reasonableness as the Secretary may prescribe . . . .

42 U.S.C. § 1395f(i)(1)(A).  By way of background, the Secretary invoked his regulatory authority in 1983 to prescribe the prospective payment system as the "test[] of reasonableness" for purposes of paying for hospice care, setting different payment rates for different types of care.  *See* Medicare Program; Hospice Care, 48 Fed. Reg. 38,146, 38,151 (Aug. 22, 1983); Medicare Program; Hospice Care, 48 Fed. Reg. 56,008, 56,016 (Dec. 16, 1983).  Read in this light, § 1395f(i)(1)(A) provides that participating hospices are entitled to receive payment for the amount determined pursuant to the prospective payment system, so long as that amount does not

exceed "the limitation under paragraph (2)"—that is, the aggregate cap.  Again, the statute says nothing about periodic or historic (unreconciled) payments but, rather, merely provides that CMS must pay the hospice the amount to which it is entitled under the Medicare statute and regulations up to, but not in excess of, the aggregate cap.  Unsurprisingly, the Medicare statute does not include a deduction for sequestration.

Finally, Gentiva's reliance on the governing regulations provides no further support to its claim.[4]  The regulations merely iterate that "the total Medicare payment to a hospice for care furnished during a cap period is limited by the hospice cap."  42 C.F.R. § 418.308(a).  Again, nothing in this language suggests that CMS must rely on periodic or historic payments, without regard to the amount actually due to the hospice under the Medicare statute.  To be sure, the same regulation also states that "[p]ayments made to a hospice during a cap period that exceed the cap amount are overpayments and must be refunded."  *Id.* § 418.308(d).  But the reference to "[p]ayments made" cannot have the same meaning as the "amount paid" or "amount of payment made" referenced in the statute, because the regulation expressly allows that such payments may "exceed the cap amount," *id.*, while the statute mandates that "[t]he amount of payment made . . . may not exceed the cap amount," 42 U.S.C. § 1395f(i)(2)(A).  If monthly payments constituted the "amount paid" and were themselves limited by the annual aggregate cap, then the regulatory regime of the prospective payment system—which facilitates prompt payment to hospices by paying pre-set rates and delaying comparison to the annual aggregate cap until year-end—would violate 42 U.S.C. § 1395f(i), because, in at least some cases, the system allows payments in

---

[4] Gentiva's arguments seem to employ the regulations to bolster its reading of the statute, rather than advancing an independent theory that CMS's methodology, even if consistent with the statute, violated the regulations.  *See* Dkt. 8-1 at 8, 12–13, 34.  The Court, accordingly, addresses the regulations in the context of analyzing the Medicare statute.  In any event, for the reasons discussed, the Court is unpersuaded by Gentiva's reading of the regulations.

excess of the annual aggregate cap to be made throughout the course of the year.  Gentiva, unsurprisingly, does not dispute the legality of the prospective payment system.  But against a regulatory backdrop that allows monthly payments to overpay hospices, it is untenable to claim that these payments, rather than the final payment calculation made by MACs at year-end, are subject to the annual aggregate cap.

Further statutory evidence weighs heavily against Gentiva's reading of the statute.  As the Board observed, "the fact that payments made during the year are subject to not just the aggregate cap but also a cap related to inpatient care" reinforces the conclusion "that the payments made during the year are *interim*" and are not the *final* payments subject to the cap. Dkt. 14-1 at 15 (AR 15).  As explained above, the amount payable for hospice care is subject to two caps—the aggregate cap and the inpatient cap, which limits reimbursement for inpatient hospice services to "20 percent of the aggregate number of days during" a "12-month period" for which the patient received hospice care, 42 U.S.C. § 1395x(dd)(2)(A)(iii); *see also* 42 C.F.R. § 418.302(f).  Like the aggregate cap, the inpatient cap cannot be applied until year-end.  As a result, the monthly payments are necessarily preliminary—or "interim"—until the inpatient cap is applied at the end of the year.  And that conclusion is, in fact, consistent with the way the Medicare program works: "(1) for every cap year, the Medicare program sends each hospice a 'determination of program reimbursement letter, which provides the results of the inpatient and aggregate cap calculations' for that cap year," and "(2) if the hospice is dissatisfied with that final determination for the cap year, it may file an appeal with the Board."  Dkt. 14-1 at 15 (AR 15).  In short, payment determinations are not final until after the year-end reconciliation is completed, and any payment received before then is preliminary.

Gentiva also unpersuasively argues that CMS guidance militates in favor of its interpretation of the phrases "amount paid" and "the amount of payment made." The Medicare Benefit Policy Manual ("BPM"), according to Gentiva, makes clear that "'payments made' means 'actual Medicare payments made' for hospice services." Dkt. 8-1 at 13. In two sections titled "Aggregate Cap on Overall Reimbursement to Medicare-certified Hospices" and "Actual Medicare Payments Counted," the BPM stipulates that:

> Overall aggregate Medicare payments made to a Medicare-certified hospice are subject to an aggregate cap, calculated by the . . . MAC . . . at the end of the hospice cap period. . . . The total actual Medicare payments made for services furnished to Medicare beneficiaries during the cap year (November 1st to October 31st ) are compared to the aggregate cap for this period. Any actual Medicare payments in excess of the aggregate cap must be refunded by the hospice.
>
> . . .
>
> "Total actual Medicare payments made for services furnished to Medicare beneficiaries during the cap year" refers to Medicare payments for services rendered beginning November 1 and ending October 31, regardless of when payment is actually made. All payments made to hospices on behalf of all Medicare hospice beneficiaries receiving services during the cap year are counted.

Dkt. 14-1 at 502–03 (AR 1373–74). The BPM's references to "actual Medicare payments," in Gentiva's view, make clear that the Medicare statute's references to "payments made" mean the periodic payments hospices receive over the course of the year. And because the sequestered amounts were never actually paid, Gentiva contends that they ought not be included when MACs apply the aggregate cap to determine overpayments. Dkt. 8-1 at 34–36; Dkt. 12 at 19.

As an initial matter, even if agency guidance supported Gentiva's reading, the guidance could not override the plain meaning of the statute. But neither excerpt from the BPM necessitates Gentiva's interpretation. Indeed, as the Secretary notes in his briefing, the second excerpt, if anything, undermines Gentiva's position. Dkt. 9-1 at 23. The guidance defines

"actual Medicare payments made for services furnished . . . during the cap year" as payments made for services provided during the year, "regardless of when payment is actually made." Dkt. 14-1 at 503.  Thus, the guidance makes clear that the payment amount subject to the aggregate cap encompasses more than the sum of checks cut by a MAC during a fiscal year.  For example, "if Medicare determines after the fiscal year closes that it should not have disallowed a claim for hospice reimbursement, it will pay the hospice in the subsequent year, but the payment counts against the hospice's cap for the year in which the hospice provided the services."  Dkt. 9-1 at 23.  In some cases, the hospice never receives a check, but instead, the payment is incorporated into the MAC's final reimbursement determination: "it is not at all uncommon for the reconciliation process to increase Medicare's obligation to a hospice which, in turn, reduces its overpayment."  Dkt. 13 at 20.  The fact that "total actual Medicare payments made" include payments that hospices did not in fact receive during the year undercuts Gentiva's contention that the periodic payments are the lodestar for calculating the cap.

Finally, even if the text of the Medicare statute did not, standing alone, carry the day, the Court would still sustain the Board's conclusion because, unlike Gentiva's argument, it honors the mandate of the Budget Control Act.  Although the Board is not entitled to *Chevron* deference when it comes to its interpretation of the BCA (because it is not charged with administering that statute, *see SW Gen., Inc. v. NLRB*, 796 F.3d 67, 74 n.4 (D.C. Cir. 2015); *Pro. Airways Sys. Specialists, MEBA v. FLRA*, 809 F.2d 855, 857 n.6 (D.C. Cir. 1987)), the Court is nonetheless persuaded that the Board correctly determined that that the 2 percent sequestration should apply to the final "amount paid"—that is to the amount paid "*after* the hospice aggregate cap itself has been applied."  Dkt. 14-1 at 16 (AR 16) (emphasis in original).  In cases in which the hospice did not exceed its aggregate cap based on the final, reconciled payment amount, there was no need to

make any further adjustments.  The 2 percent reduction was already reflected in the interim

payments, and no further adjustment was required.  But in cases in which the hospice exceeded

its aggregate cap based on the final, reconciled payment amount, "CMS had to develop a cap-

year-end reconciliation and accounting process that simulated the proper process" under which

the sequestration deduction was made after application of the cap.  *Id.* at 17–18  & tbl.1 (AR 17–

18).  In the Board's view, that process did "*not* 'double dip' for any hospices" but, rather,

ensured "that the aggregate cap [was] applied separately from sequestration to prevent

sequestration from affecting or interfering with or otherwise altering application of the aggregate

cap in the first instance."  *Id*. at 18 (AR 18) (emphasis in original).

Again, the Board's conclusion is supported by the relevant statutory text.  The Budget

Control Act requires OMB and the President to effectuate a reduction in "[d]iscretionary

appropriations and direct spending accounts" across the board.  2 U.S.C. § 901a.  "When

implementing the sequestration of direct spending," moreover, OMB must limit "the percentage

reduction for the Medicare programs specified in section 906(d)'" to no "more than 2 percent for

a fiscal year."  *Id.* § 901a(6)(A).  Tellingly, the 2 percent reduction, which CMS applied in this

case, is a reduction in spending "for the Medicare programs" at issue, not a 2 percent reduction

in periodic or interim payments or in any other component of the program.  Consistent with this

understanding, the President's Executive Order required a reduction in "budgetary resources in

each non-exempt budget account," Executive Order, 78 Fed. Reg. at 14,633, a result that could

not be achieved by applying sequestration only to interim payments prior to reconciliation and

application of the caps specified in the Medicare statute.  The OMB memorandum, likewise,

required "reductions of 2.0 percent to Medicare," OMB Report at 1, not a reduction to interim

payments.

In pressing its argument, Gentiva relies on 2 U.S.C. § 906(d)(1)(A), which provides that the "percentage reduction . . . shall apply" in Medicare Part A cases "to individual payments for services furnished during the one-year period beginning on the first day of the first month" after issuance of the sequestration order.  But "individual payments," read in context, does not mean periodic or interim payments.  To the contrary, § 906(d)(1), like the other relevant provisions of the Budget Control Act, the Executive Order, and the OMB memorandum, looks to reduce spending on the covered "programs" by the specified percentage.  Significantly, the "individual payments" language that Gentiva seizes on is followed by this qualification: "such that the reduction made in payments under [the sequestration] order shall achieve the required *total* percentage reduction in those payments for that period."  *Id.* (emphasis added).  The Secretary's interpretation, which reads "individual payments" to refer to payments to individual hospices, achieves the "total percentage reduction" required by the BCA.  *Id.*  Under Gentiva's theory, however, something less than a "total" program reduction of 2 percent would be achieved. *Silverado*, 2020 WL 6821073, at *5–6.  The Secretary's reading is preferable to Gentiva's because it gives meaning to all parts of the BCA, and it serves the BCA's across-the-board, budget-cutting purpose in a coherent and workable manner.

Accordingly, each of Gentiva's substantive challenges to the Board's reading of the Medicare statute and Budget Control Act fail.

**B.    Challenges to Materials Considered by the Board**

Gentiva also argues that the Board relied on improper or inapposite materials in its decision.[5]  The Court is unpersuaded.

---

[5] These challenges arguably have relevance to whether the PRRB's interpretation of the Medicare statute was reasonable under *Chevron* step two.  But because the Court concludes that

First, Gentiva alleges that "the Board relied almost exclusively on the secret March 2015 TDL, treating it—rather than the governing statutes, regulation, and published agency guidance—as the applicable law." Dkt. 8-1 at 31. That is incorrect. Even a cursory review of the Board's lengthy and detailed decision demonstrates that it engaged in its own analysis regarding the proper interpretation of the Medicare statute and regulations and the Budget Control Act. Dkt. 14-1 at 14–21 (AR 14–21). It is true that the Board described the TDL in its opinion. *See id.* at 10–11 (AR 10–11). But the Board described the TDL before independently assessing the legality of the approach that it mandated and that the MACs applied. *See e.g.*, *id.* at 13 (AR 13) (noting that the "dispute arises from the TDL's cap-year-end reconciliation and accounting process"). The Board no more deferred to the TDL than the Court of Appeals defers to this Court when it describes the Court's holding on a question of law.

This resolves the matter, but the Court pauses to note that Gentiva's repeated disparagement of the TDL as "secret" is, at the very least, overstated. *See, e.g.*, Dkt. 8-1 at 32–33, 42. Although CMS prohibited MACs from distributing the letter itself, it instructed MACs to "send a listserv to providers explaining the sequestration impact on the hospice cap calculation," Dkt. 14-1 at 26 (AR 26); required that MACs notify hospices if their cap determinations would be reopened, *id.*; and allowed MACs to "do local messaging as needed" on the TDL's methodology, *id.* If CMS intended to keep the contents of its TDL secret, it was a secret poorly kept.

Gentiva next claims that the Board "[r]ecogniz[ed] that its position f[ound] no support in the plain language of the existing law or CMS's published interpretation of existing law, [and

---

the claims lack merit, it is of little moment whether they are considered as part of that analysis or as a separate, procedural challenge.

thus] relie[d] on materials that do not apply to" hospices.  Dkt. 8-1 at 44.  Gentiva claims, for

example, that the Board improperly relied "on payment law applicable to" hospitals exempt from

the prospective payment system, even though "[h]ospices are not hospitals and are not subject to

the hospital payment rules cited."  *Id.*  This argument fails for at least two reasons.  First,

contrary to Gentiva's characterization, the Board's decision makes clear that it references the

hospital provisions simply by way of analogy, not as binding law or precedent.  *See* Dkt. 14-1 at

16 n.64 (AR 16) ("The hospice cap functions in the same way as the ceiling on the rate-of-

increase of inpatient operating costs recoverable by a hospital . . . .").  Second, the decision refers

to the hospital provision only as the last in a list of factors "reinforc[ing]" "[t]he concept that

Medicare payments to hospices must be viewed on a cap-year basis," a conclusion that the Board

had already reached without regard to the hospital provision.  *Id.* at 15–16 (AR 15–16).  Even if

the comparison to hospitals were less than compelling, the Board provided independent,

"adequate reasons for its decision[]."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125

(2016).

Gentiva also takes aim at the Board's "inexplicabl[e] and repeated[] refer[ences] to the

[h]ospices' fixed per diem payments as 'interim' payments."  Dkt. 8-1 at 46.  Gentiva argues that

these payments cannot be interim because (1) in contrast to regulations governing hospital

payments, the regulations governing hospices make no reference to "interim payments," and (2)

the hospice's per diem payments reflect fixed rates and are "the only Medicare payments that

hospices receive."  *Id.*  But the Board explained that because hospices' monthly payments may

be subject to refunds at year-end based on the MACs' final determinations of reimbursement,

these payments "are <u>effectively</u> *interim* payments."  Dkt. 14-1 at 15 (AR 15) (underline added).

This characterization dispenses with Gentiva's objection.  As the Secretary correctly explains:

> [I]t is quite common for a hospice's final determination of program reimbursement to include adjustment "up or down." . . . Cap numbers and provider reimbursement can change for a variety of reasons including a miscount or reallocation of beneficiary days, . . . updated data, . . . a finding that [a] beneficiary is not eligible for hospice benefits, . . . or a finding that Medicare paid for a claim that should have been covered by another party . . . . While it is certainly true that the efficiency of the electronic claims filing process rarely, if ever, results in Medicare "cutting a check" to a hospice at year's end, it is not at all uncommon for the reconciliation process to increase Medicare's obligation to a hospice which, in turn, reduces its overpayment. Likewise, MACs routinely reopen hospice cost reports to increase a hospice's total allowable Medicare reimbursement.

Dkt. 13 at 19–20.  "Regardless of the nomenclature, . . . [a]ll preliminary payments are subject to reconciliation at year-end," *id.* at 17, and that is what mattered for purposes of the Board's analysis.

The Court, accordingly, is convinced that the Board "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Encino Motorcars*, 136 S. Ct. at 2125 (quoting *Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Its "explanation is clear enough that its [decision-making] 'path may reasonably be discerned.'"  *Id.* (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).  That is all that the law requires.

## C.      Challenges to the Notice Provided to Hospices

Finally, Gentiva maintains that hospices received inadequate notice of the methodology adopted by CMS and approved by the Board and that CMS failed to follow required procedures before "chang[ing] a 'substantive legal standard' affecting Medicare benefits."  Dkt. 8-1 at 42 (quoting *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1808 (2019)).  The Court is, once again, unpersuaded.

The governing principles are well settled.  "Agencies are," of course, "free to change their existing policies as long as they provide a reasoned explanation for the change," *Encino*

*Motorcars*, 136 S. Ct. at 2125, and their new policies are otherwise lawful.  But when an agency changes an existing policy, it "must at least 'display awareness that it is changing position' and must "'show that there are good reasons for the new policy.'"  *Id.* at 2126 (quoting *FCC v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009)).  Moreover, agencies must recognize where "longstanding policies . . . have 'engendered serious reliance interests'" and must take those interests "'into account.'"  *Id.* (quoting same).

Here, Gentiva argues that neither the TDL nor the Board's decision acknowledged that CMS had departed from established policy, including the policy set forth in 42 C.F.R. § 418.308(d) and the BPM.  But, as explained above, the Court has already concluded that the TDL and Board decision are consistent with the governing regulations and BPM.  And beyond that, it is difficult to understand how CMS or the Board could have departed from longstanding policies when they decided for the first time how the hospice aggregate cap and sequestration should interact.

Similarly, Gentiva maintains that the Secretary's "published guidance and the MACs' consistent use of net reimbursement to calculate overpayments through the original cap determinations for [FY 2013], and hospices' reliance on that guidance and longstanding practice, preclude retroactive application of the MACs' new calculation method."  Dkt. 8-1 at 40–41.  But, for the reasons just discussed, the Court is unpersuaded that the MACs' approach constitutes a "new calculation method."  As the Board explained, "neither the sequestration order nor the CMS TDL altered *any* aspect of the calculation of the aggregate cap.  Rather, CMS implemented sequestration in a manner to ensure that no aspect of those cap calculations was altered by sequestration."  Dkt. 14-1 at 22 (AR 22).  It is true that CMS did not implement sequestration through a regulation, but the reason is that Congress imposed sequestration by statute, and

Congress charged OMB and the President with implementing the sequestration reductions. 2 U.S.C. § 901a(5) & (6).

Gentiva does identify one instance of change: the change between the MACs' initial approach to calculating final determinations for fiscal year 2013, and their revised approach following the March 2015 TDL.  Dkt. 8-1 at 41.  As Gentiva's MACs explained to the Board, "[a]pplication of the sequestration payment withhold for all [h]ospice [p]roviders got off to a rocky start.  The first overpayment calculations did not take . . . sequestration into account. However, this omission was discovered and corrected."  Dkt. 14-1 at 466 (AR 1142).  The contractors accordingly "published a document," *id.* at 11 n.33 (AR 11), communicating that CMS had "recently provided instructions on how the sequestration amounts [would] be handled," and explaining the manner in which "the aggregate hospice cap determination ha[d] been revised to incorporate the sequestration amounts," *id.* at 474 (AR 1321).  Although Gentiva is thus correct that the MACs changed methodologies between their initial FY 2013 final determinations and their revised determinations, the original approach was neither final nor embodied in any official agency action or policy.  Accordingly, while invoking the principle that "an agency must  . . . be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account,'" *Encino Motorcars*, 136 S. Ct. at 2126 (quoting *Fox Television*, 556 U.S. at 515), Gentiva fails to identify any "longstanding policy," much less a "serious reliance interest[]" betrayed by the MACs' revised approach.  Among other difficulties with its argument, Gentiva identifies no decisions or actions that its hospices took in reliance on the methodology that the MACs initially applied, nor has it even alleged that it was or will be required to make any "systemic, significant changes" going forward.  *Encino*, 136 S. Ct. at 2126.

Nor is the Court persuaded by Gentiva's contention that the Secretary was required to act, if at all, by rulemaking.  To be sure, the Medicare statute provides that "[n]o rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing . . . the payment for services . . . under this subchapter shall take effect unless it is promulgated by the Secretary by regulation."  42 U.S.C. § 1395hh(a)(2); *see also Allina Health*, 139 S. Ct. at 1808.  And another statutory provision provides that "manual instructions, interpretive rules, statements of policy, and guidelines of general applicability which . . . are promulgated to carry out this subchapter" must be published in a list in the Federal Register.  42 U.S.C. § 1395hh(c)(1).  But these principles have no bearing here, where the Secretary did not establish or change a substantive legal standard; rather, *Congress* enacted the Budget Control Act, and OMB and *the President* implemented sequestration as required by the BCA.  In other words, this is the type of situation that the Supreme Court stressed it was *not* addressing in *Allina Health*:

> [W]e can imagine that the government might have sought to argue that the policy at issue here didn't "establis[h] or chang[e]" a substantive legal standard—and so didn't require notice and comment under § 1395hh(a)(2)—because the *statute* itself required it to count Part C patients in the Medicare fraction.  But we need not consider this argument . . . because the government hasn't pursued it.

139 S. Ct. at 1816.  As explained above, CMS merely applied sequestration in the manner required by law.  *See also Silverado*, 2020 WL 6821073, at *7 ("Defendant is not exercising discretion to apply the 2 percent sequestration.  Rather, the agency is integrating Congress's sequestration mandate with the Medicare Act and existing regulations.").  Accordingly, the procedural hurdles that govern discretionary decisions that CMS or the Secretary makes, like "whether to count [certain] participants in the . . . fraction" used to determine Medicare payments, *Allina Health*, 139 S. Ct. at 1809, do not apply in this context.

The Court, accordingly, concludes that all of Gentiva's process challenges fail as well.

**CONCLUSION**

For the reasons explained above, the Court will deny Gentiva's motion for summary

judgment, Dkt. 8, and will grant the Secretary's cross-motion for summary judgment, Dkt. 9.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  March 3, 2021